**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Greg Moore; et al., | ) | No. CV 19-00290 TUC RM (MAA) |
| Plaintiffs, | ) | **ORDER** |
| vs. | ) | |
| Sean Garnand; et al., | ) | |
| Defendants. | ) | |

Pending before the court is the defendants' motion, filed on March 20, 2024, to terminate the deposition of Lisa Miller pursuant to Fed.R.Civ.P. 30(d)(3) and for expenses pursuant to Fed.R.Civ.P. 30(d)(3)(C) and 37(a)(5). Doc. 441. The plaintiffs filed a response on March 22, 2024, which contains a cross-motion for sanctions and/or for an award of costs and fees pursuant to 28 U.S.C. § 1927 and Fed.R.Civ.P. 30(d)(2). Doc. 448. The defendants filed a reply on March 28, 2024. Doc. 455. The defendants supplemented the motion with a recorded exhibit on April 8, 2024. Doc. 460.

The plaintiffs in this action ("the Moores") claim their constitutional rights were violated when the defendants obtained and executed two search warrants in connection with an arson investigation into the destruction of the Forgeus Apartments on June 8, 2017. Complaint, Doc. 1; *see* Doc. 391, p. 2 ("The remaining claims in this matter are Counts One, Three and Four of the Plaintiffs' Complaint."). The Moores bring this action pursuant to 42 U.S.C. § 1983. Doc. 1, p. 4. The first warrant, for DNA and other personal effects, was executed on June 9, 2017. Doc. 1, p. 8. The second warrant, for financial documents, was

1   executed on June 14, 2017.  Doc. 1, pp. 9-10.  The Moores claim, among other things, that

2   the warrant applications were not supported by probable cause and contained "material

3   misrepresentations and omissions."  Doc. 1, pp. 16-18.

4          On March 15, 2024, at 1:58 p.m., the plaintiffs commenced their deposition of former

5   Tucson Police Detective Lisa Miller.  Doc. 441, p. 1.  Approximately one hour and 13

6   minutes later, counsel for the defendants terminated the deposition pursuant to Fed.R.Civ.P.

7   30(d)(3).  *Id.*  The defendants argue primarily that the plaintiffs' counsel's questions failed

8   to "stay within the bounds of Rule 26(b)(1) based on the claims actually stated in your

9   Complaint, as is your obligation."  Doc. 441, p. 3.

10

11          Discussion

12          The Rule reads in pertinent part as follows:

13          At any time during a deposition, the deponent or a party may move to
            terminate or limit it on the ground that it is being conducted in bad faith or in
14          a manner that unreasonably annoys, embarrasses, or oppresses the deponent or
            party. . . . If the objecting deponent or party so demands, the deposition must
15          be suspended for the time necessary to obtain an order.

16   Fed. R. Civ. P. 30(d)(3).  "Although the term 'bad faith' can have many meanings depending

17   upon the context in which it is used, one of its common connotations is to do something for

18   an 'improper purpose'."  *Boulder Falcon, LLC v. Brown*, 2023 WL 2662187, at *12 (D. Utah

19   Mar. 28, 2023); *see also* Black's Law Dictionary 166 (10th ed. 2014) ("Dishonesty of belief,

20   purpose, or motive").  "The burden of proving such conduct lies with the objecting deponent

21   [or party]."  *Rivera v. Berg Elec. Corp.*, 2010 WL 3002000, at *2 (D. Nev. July 28, 2010).

22          Detective Lisa Miller, now retired,  participated in the execution of the second search

23   warrant at Greg Moore's office on June 14, 2017.  Doc. 441, p. 2.  During the execution, she

24   took a statement from Greg Moore's office manager, Guadalupe "Lupita" Bachelier.  *Id.*

25          In preparation for the deposition, Miller reviewed a redacted audio recording of that

26   interview.  Doc. 441, p. 3.  This redacted recording was previously disclosed to the Moores

27   pursuant to a Public Records Act request in a prior lawsuit.  Doc. 441, p. 3.

28

                                          - 2 -

1    The defendants maintain that this recording "became the vehicle for harassment
2  tactics" by the plaintiffs' attorney. Doc. 441, p. 4. It turns out that the plaintiffs' attorney
3  had in his possession the *unredacted* audio recording, which he obtained in connection with
4  Greg Moore's current felony criminal case in Pima County. *Id.* The defendants assert that
5  the plaintiffs' attorney "never disclosed that unredacted recording, or his knowledge of same,
6  to Defendants prior to the Lisa Miller deposition, preferring instead to try to intimidate the
7  witness with ridiculous, unfounded claims and fear of spoiling evidence that has nothing to
8  do with any of the Moores' civil claims." Doc. 441, p. 4.

9    The court agrees that acts of intimidation, the use of "ridiculous" or "unfounded
10 claims," or accusations that the witness has spoiled evidence could evince bad faith. The
11 defendants, however, have not directed the court to specific places in the transcript where
12 each of these behaviors has occurred. They have provided a video recording of the
13 deposition for the court's use, but the court could not identify what portions of the deposition
14 the defendants' find objectionable. *See* Doc. 460.

15   The defendants do cite to that part of the deposition where the plaintiffs' counsel asks
16 Miller about where the original tape recording of her interview with Bachelier was placed.
17 Doc. 441, p. 4 (citing Tr. 10:8-16:22). But the court does not find these questions
18 objectionable. It seems reasonable for counsel to want to know if an original recording exists
19 and where it might be located. The original tape recording could be a valuable resource for
20 cross-checking the witness's memory of an interview taken some seven years ago. *See, e.g.*,
21 *Whiting v. Hogan*, 2013 WL 1047012, at *7 (D. Ariz. 2013) ("[K]nowledge and veracity of
22 the deponent are always at issue during witness testimony."); *Smith v. Logansport Cmty. Sch.*
23 *Corp.*, 139 F.R.D. 637, 646 (N.D. Ind. 1991) ("[A]n oral deposition is not merely a device
24 to uncover and develop information. It also provides a legitimate and efficient means of
25 testing a witness' knowledge, recollection and veracity."). The court does not interpret this
26 portion of the deposition as an attack on Miller for possibly mislaying the original recording.
27 But even if it were, it would not necessarily constitute bad faith. *See, e.g.*, *Whiting v. Hogan*,
28

- 3 -

1  2013 WL 1047012, at *7 (D. Ariz. Mar. 14, 2013)  (Counsel's statements made at the

2  deposition that, "I have further proof that perhaps your client has been less than truthful

3  about these disclosures," "did not evince harassing conduct.").

4        The plaintiffs' counsel did not reveal before the deposition everything he knew about

5  Miller's original interview of Bachelier, but the defendants do not direct the court to a Rule

6  or case indicating that such practice would evince bad faith.  Moreover, it not clear why

7  counsel's access to an unredacted recording of the interview would prejudice the witness.

8  At the start of the deposition, Miller explained that beforehand, she reviewed her police

9  report, the photographs that were taken at the offices, and the redacted audio recording of her

10 interview with Bachelier.  Doc. 441-2, p. 17.  When counsel asked her, "did you feel there

11 was anything else that you needed to help refresh your recollection about what happened that

12 day?" Miller replied "No. Of course, it's always nice to – when you conduct an interview

13 with someone, to have the entire audio recording." Doc. 441-2, p. 18.  She continued: "[I]t's

14 nice to have the entire recording, but my reports are usually very detailed and thorough into

15 [sic] regards – in regards to what people tell me when I conduct an interview with them."

16 *Id.*  Over the defendants' counsel's objection, Miller explained that her original recording

17 was stored in the DIMS system at the Tucson Police Department.  441-2, pp. 19-20.

18       It does not appear that the plaintiffs' counsel's access to the unredacted recording

19 caused prejudice to the witness or that he used this recording in a manner that annoyed or

20 embarrassed the deponent.  The defendants do not point to any specific question or portion

21 of the deposition that seems to rely on information taken from the unredacted interview.

22 Moreover, Miller stated that while "it's always nice to . . . have the entire audio recording,"

23 she did listen to the redacted recording and did review her police report, which are "usually

24 detailed and thorough." Doc. 441-2, p. 18.  Apparently, the unredacted recording is in the

25 possession of TPD and the defendants could have provided it to Miller if they wished to do

26 so.  And of course, Miller was actually there, in person, during the Bachelier interview.

27       The court agrees with the defendants that the timing of the plaintiffs' disclosure of the

28 unredacted recording, one business day after the deposition, as part of their duty to provide

1    supplemental discovery is problematic.  On this record, however, the court cannot find that

2    the possibly late disclosure evinces bad faith.

3         The defendants further assert that the plaintiffs' counsel's use during the deposition

4    of an unredacted version of Miller's police report was an "impropriety."  Doc. 441, p. 5.

5    They do not direct the court to a Rule or case explaining why they believe this practice

6    evinces bad faith.  Presumably, this report is already in the possession of the defendants.

7    Miller wrote it, so its contents could not have been a complete surprise.

8         There was a point in the deposition when the defendants' counsel accused the

9    plaintiffs' counsel of "being harassing with your tone."  Doc. 441-2, p. 60.  Bachelier

10   explained to Miller that she did not know anything about the fire "until the officers came in

11   and Greg told her 'sorry about all of this.'"  Doc. 441-2, 60.  Miller did not, however, ask

12   her, "What officers came in?"  *Id.*  The plaintiffs' counsel followed up as follows: "You

13   didn't ask her because you already knew that Detective Garnand had come there, put Greg

14   in handcuffs, and taken him to a substation.  You already knew that.  That's why you didn't

15   ask her about that, correct?"  *Id.*  Miller again stated simply that she "didn't ask her which

16   officers came in," and again the plaintiffs' counsel asked her a leading question: "The reason

17   you didn't ask her was because you already knew that Detective Garnand had come there

18   days before, put Greg in handcuffs, and taken him to the Alvernon substation, isn't that

19   true?"  Doc. 441-2, pp. 60-61.  Miller answered, "I knew that Detective Garnand had been

20   to those offices before, yes.  I believe I knew that then."  Doc. 441-2, p. 61; Video, Doc. 460

21   at 57:24.

22        Counsel's tone was insistent, and he did ask the same leading question twice, but the

23   court does not find that this exchange unreasonably annoyed, embarrassed, or oppressed the

24   deponent.  Doc. 460 at 57:16.  The witness here is a 20-year veteran of the Tucson Police

25   Force, who has been deposed before and has testified at trial a number of times.  Doc. 441-2,

26   p. 16.  She displayed no acute discomfort during the exchange and, based on her background,

27   would not be expected to do so.  Doc. 460 at 56:15 – 57:24.

28

Finally, the defendants argue that the questioning of Miller exceeded the scope of allowable discovery under Fed.R.Civ.P. 26(b)(1).  They assert that counsel for the plaintiffs asked questions "suggesting, without any foundation, additional claims never asserted in this case. . . ."  Doc. 441, p. 5.  For example, he asked if "Detective Garnand told his police colleagues, prior to their execution of the Second Warrant, that Mrs. Moore was involved in the crimes under investigation."  *Id.*  He asked if Miller "was somehow responsible for reviewing and evaluating the already-obtained Second Warrant for compliance with the Fourth Amendment."  *Id.*  He further "asked questions suggesting that Lupita Bachelier's interview had been conducted improperly" or if "Detective Miller had blocked Lupita Bachelier's exit from the room where she was interviewed."  *Id.*

The deposition was finally suspended when counsel asked Miller about the questions she had asked Bachelier about computers.  Counsel asked Miller:  "You were asking about computers because when she [Bachelier] identified computers in the business, those computers were going to be seized, correct."  Doc. 441-2, p. 62.  Miller stated simply that the "[c]omputers were on the search warrant,"  but counsel again asked his leading question:  "You wanted to know how many computers, where they were in the office because you were going to seize those pursuant to the search warrant, correct?"  Doc. 441-2, pp. 62-63.  Counsel for the defendants then objected pursuant to Rule 26(b)(1) and suspended the deposition.  Doc. 441-2, p. 63;  Doc. 460 at 1:00:23.  The defendants argue that these questions have "no bearing on the civil claims in this case" and accordingly counsel for the plaintiffs acted improperly.

The court agrees that discovery should be confined to the "claims and defenses asserted in the pleadings."   Fed.R.Civ.P. 26, Advisory Committee's Note (2000 Amendment). The recent change in the text of Rule 26 "signals to the parties that they have no entitlement to discovery to develop new claims or defenses that are not already identified in the pleadings."  *Id.*  But the court finds to the contrary that the plaintiffs' counsel's questions did relate to the claims that already appear in the Complaint.

1   The plaintiffs' claims related to the second search warrant are as follows: "(1)
2   Defendants obtained the Second Search Warrant through judicial deception; (2) even absent
3   judicial deception, the Second Search Warrant lacked probable cause; (3) even if the Second
4   Search Warrant were valid, Defendants executed it unreasonably by seizing items outside the
5   warrant's scope; and (4) Officer Garnand's detention of Mrs. Moore during the search of the
6   Moores' home violated her Fourth Amendment rights." Doc. 389, p. 5.  Counsel's questions
7   related to how the Second Search Warrant was obtained and how it was executed.  His
8   questions to Miller about how she identified which computers and electronics were going to
9   be seized are related to his claim that the scope of the warrant was overbroad and improperly
10  authorized the seizure of computer records relating to *all* of Greg Moore's businesses.  Doc.
11  448, pp. 5-6.  These were proper areas of inquiry.  *See, e.g.*, Doc. 389, pp. 6-7 ("The Second
12  Search Warrant authorized, among other things, without any limitation as to time, the seizure
13  of a vast array of financial information related to Mr. Moore and 'associated businesses' that
14  constitute evidence of a crime . . . .  But Officer Garnand's affidavit failed to establish
15  probable cause to believe that *all* these items were connected to criminal activity.")
16  (punctuation modified, emphasis in original);  Doc. 389, p. 7, n. 5 ("Even if we were to
17  overlook this flaw in the affidavit, the warrant allowed a search of a vast list of electronic
18  devices and data . . . [t]he supporting affidavit did not even attempt to justify such a broad
19  search.").

20  The defendants assert in their reply brief that the Complaint does not contain a claim
21  relating to particularity or overbreadth.  Doc. 455, pp. 1-2.  The Ninth Circuit, however,
22  found otherwise in a prior interlocutory appeal.  Doc. 389, pp. 6-8; p. 8, n. 6  ("We reject
23  Defendants' argument that Plaintiffs did not make an overbreadth claim as to the Second
24  Search Warrant.").  And this court is required to follow the Ninth Circuit.

25  But even if these were not proper areas of inquiry, simply asking questions outside the
26  scope of Rule 26(b)(1) does not, by itself, constitute "bad faith" or otherwise prove that the
27  deposition is being conducted "in a manner that unreasonably annoys, embarrasses, or
28  oppresses the deponent or party."  *See Rivera v. Berg Elec. Corp.*, 2010 WL 3002000, at *2

(D. Nev. July 28, 2010)  ("[T]he mere fact that more than one, or even that a series of irrelevant questions is asked does not, by itself, constitute the annoyance or oppression contemplated by (30)(d)(3).").

In their reply, the defendants direct the court to *Boyd v. Univ. of Maryland Med. Sys.*, 173 F.R.D. 143, 146 (D. Md. 1997), which quotes the District of Maryland Local Discovery Guidelines for the proposition that "it is also presumptively improper to ask questions clearly beyond the scope of discovery permitted by Fed.R.Civ.P. 26(b)(1) . . . and continuing to do so after an objection shall be evidence that the deposition is being conducted in bad faith, or in such a manner as unreasonably to annoy, embarrass or oppress the deponent or party, which is prohibited by Fed.R.Civ.P. 30(d)(3)."  This court agrees that asking questions "*clearly* beyond the scope of discovery permitted by Fed.R.Civ.P. 26(b)(1)" and "continuing to do so after an objection" is some evidence that the deposition is being conducted in bad faith.  *Boyd* at 146  (emphasis added).  This is particularly true if the questions are "of a personal nature" or if the attorney "repeatedly ask[s] the same or substantially identical question of a deponent if the question has already been asked and fully and responsibly answerer by the deponent."  *Id.*  In this case, however, counsel's questions were not clearly beyond the scope and not of a personal nature.  When he repeated a question it was usually[1] when he believed that Miller was giving an incomplete or evasive answer. The court finds that the Miller deposition did not violate Fed.R.Civ.P. 30(d)(3).

The deposition here started at 1:58 and went until 2:52 when the parties took a break for twelve minutes.  Doc 441-2, pp. 13, 57.  The deposition started again at 3:04 and was suspended at 3:11 after only 7 minutes.  Doc. 441-2, pp. 57, 63.  All in all, the deposition lasted little over one hour.  It does not appear that the deposition was conducted in a manner that was oppressive in its length.  Neither does it appear to have been conducted in a manner that was particularly annoying or embarrassing especially considering the deponent who, as the court noted above, was a 20-year veteran of the Tucson Police Department.  One would

---

[1] Counsel also repeated his questions if the witness did not have a chance to give an answer the first time due to attorney rhubarb.

1   expect that a police detective would be used to questions about what she did, or heard, or said

2   during the execution of a search warrant.

3

4       IT IS ORDERED that the defendants' motion, filed on March 20, 2024, to terminate

5   the deposition of Lisa Miller pursuant to Fed.R.Civ.P. 30(d)(3) and for costs is DENIED.

6   Doc. 441.  The witness shall be produced for deposition within 30 days.  Counsel shall work

7   together to set the deposition on a mutually agreeable date.  The plaintiffs' cross-motion for

8   sanctions and/or for an award of costs and fees is also DENIED.  Doc. 448.  This deposition

9   took place before the court issued its order resolving the plaintiffs' previous motion to

10  compel discovery.  Doc. 432.  Counsel conducted this deposition without having the benefit

11  of the directions contained in that order.

12      DATED this 16th day of April, 2024.

Honorable Michael A. Ambri
United States Magistrate Judge